IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

CRIMINAL ACTION NO.
1:15-CR-82-TCB-LTW

GINO SHULER,

Defendant.

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS DEFENDANT READY FOR TRIAL[1]

Pending before this Court is Defendant Gino Shuler's Motion to Suppress (Doc. 292). This Court convened an evidentiary hearing with respect to Defendant's Motion on June 28, 2017. (Doc. 586). On August 18, 2017, Defendant filed his post-hearing brief. (Doc. 592). The Government filed its response to Defendant's post-hearing brief on September 19, 2017. (Doc. 606). Although Defendant had until October 5, 2017, to file a reply, on October 5, 2017, Defendant informed the Court that he would not be filing a reply. Accordingly this case is ripe for a ruling. For the reasons set forth below,

---

[1] This Court observes that this Defendant has been indicted with additional Defendants and that matters pertaining to Co-Defendant Angela Williams is still pending. Pursuant to 18 U.S.C.§ 3161(h)(7) (the Speedy Trial Act) the time for commencing this Defendant's trial may be stayed until such time as the other Defendant has been certified ready for trial. Hence, it is not necessary to place the above-named Defendant's case on the calendar for trial at this time.

Defendant's Motion to Suppress should be **DENIED**.  (Doc. 292).

**DEFENDANT'S MOTION TO SUPPRESS**

## I.    FACTUAL BACKGROUND

On March 11, 2015, the Grand Jury returned an Indictment charging Defendant Gino Shuler ("Defendant") with one count of conspiracy, five counts of stealing money of the United States, and five counts of aggravated identity theft, all of which arise from an alleged scheme to cash stolen United States Treasury checks.  (Doc. 1, at 1-9). Defendant argues in his Motion to Suppress that the evidence collected and seized by the police when he was stopped while driving on I-75 in Lamar County, Georgia, should be suppressed because the police detained him for questioning unrelated to the reasons for the initial stop.  Defendant also argues the police officer did not have reasonable suspicion of criminal activity which would justify such extended questioning.

At this Court's evidentiary hearing, the Court received testimony from Sergeant Brett Newman, who was the officer primarily engaged in the questioning of Defendant at the traffic stop, and the Government submitted as evidence a video of the entire stop recorded from the dashboard camera of Sergeant Newman's patrol car.  (Transcript of June 28, 2017 Evid. Hrg., hereinafter "Tr.," 8, 18-19; Gov't Ex. A).  On April 18, 2011, Sergeant Newman served as a member of the Lamar County Sheriff's Office traffic interdiction team, which was responsible for not only enforcing traffic laws and ensuring the general safety of the motoring public, but also observing whether motorist engage in other indicators of criminal activity.  (Tr. 6).  Sergeant Newman testified that

2

members of the traffic interdiction team "take [a traffic] stop a little bit further than just a [traffic] ticket." (Tr. 7). In that vein, members of the traffic interdiction team attend training and sharing of information in things that are trending in narcotic trafficking. (Tr. 7). Members are trained to "pick up heightened levels of nervousness through different body language indicators, such as hands shaking." (Tr. 7).

Because Sergeant Newman's position also involved handling a K-9 unit, Sergeant Newman also received a 320-hour training course on working with the K-9. (Tr. 8-9). Sergeant Newman's K-9 unit was trained to detect the odors of various narcotics, such as marijuana, methamphetamine, heroin, and cocaine, and the K-9 unit is certified in narcotics detection by the National Narcotics Detector Dog Association. (Tr. 9, 11). Sergeant Newman and the K-9 unit successfully completed courses in narcotics detection, and the dog was certified in narcotics detection by the National Narcotics Detector Dog Association in 2010. (Tr. 11-13). Sergeant Newman and the K-9 unit successfully obtained recertification every year Sergeant Newman worked at Lamar County, and Sergeant Newman and the dog typically trained for at least eight hours a month in narcotic detection and tracking. (Id.).

A. **Sergeant Newman Pulled Over Defendant on I-75**

On October 22, 2012, Sergeant Newman, accompanied by his supervisor, Lieutenant Chad Payne, and his K-9 unit, Paco, was monitoring traffic on I-75 south near mile marker 201 in Lamar County in the daytime, when he pulled over Defendant for following another car too closely. (Tr. 4-6, 8, 16-17, 44; see generally Gov't's Ex.

3

A). While Sergeant Newman's patrol car was positioned perpendicular to the highway, he noticed a black vehicle traveling in the center lane and following another vehicle at less than a car length's distance. (Tr. 17). Once there was a break in the traffic, Sergeant Newman pulled out, accelerated to catch up to the black vehicle, and activated his blue lights. (Tr. 18). The driver of the black vehicle immediately signaled and pulled over into the right shoulder of the road. (Tr. 18, 51; Gov't's Ex. A, at 00:20). Sergeant Newman testified that while he was driving his patrol car behind the black car, something burning flew out of the car and hit the windshield of his patrol car. (Tr. 20-21; Gov't's Ex. 3). The video showed Sergeant Newman commenting, "He just hit my windshield with something," and Lieutenant Payne responding, "Yeah, sure did." (Tr. 20; Gov't's Ex. 1, at 00:27).

Sergeant Newman, who was uniformed and wearing a gun on his side which was visible, exited the patrol car approached the black vehicle on the passenger side. (Tr. 21, 53-54). Sergeant Newman's partner, Lieutenant Payne, also exited the patrol car and was wearing his uniform and armed with a holstered gun. (Tr. 53-54, 69; Gov't's Ex. 1, at 01:21). Sergeant Newman, while at the passenger side window, leaned down and asked Defendant, who was driving, for his driver's license. (Tr. 21-22). The passenger, who was the driver's brother, Maurice Shuler, asked Sergeant Newman whether Sergeant Newman wanted his license, and Sergeant Newman clarified that he wanted Defendant's license because he was driving. (Tr. 22, 29; Gov't's Ex. A, at 01:09). Sergeant Newman testified that he noticed an overwhelming odor of a fruity air

4

freshener, which Sergeant Newman referred to as a masking agent because it is typically used in drug trafficking to conceal the odor of marijuana. (Tr. 22).

When the driver of the vehicle, Defendant Gino Shuler, reached across the passenger to offer his license, Sergeant Newman waited a moment before taking Defendant's license so that he could observe Defendant's demeanor. (Tr. 23-24). According to Sergeant Newman, law enforcement officers are trained not to immediately take the license and to make the driver hold out their hand. (Tr. 23). Sergeant Newman noticed that Shuler's arm was shaking and he appeared extremely nervous. (Tr. 23-24). In the mean time, the passenger "was breathing heavily and just pretty much [had] a blank stare straight out of the windshield." (Tr. 24). Sergeant Newman states that after the stop, the driver never turned off the turn signal even though it continued its audible clicking sound during the duration of the traffic stop, which indicated to Sergeant Newman that the driver was extremely nervous. (Tr. 25). Neither Defendant nor his brother threatened Sergeant Newman in any way. (Tr. 51).

> **B.** **Sergeant Newman Asked Defendant a Number of Questions About the Smell Emanating From the Car, What Defendant Had Thrown Out of the Car, and Where Defendant and His Brother Were Headed**

Sergeant Newman directed Defendant to exit the vehicle and come around to the back side of the black car. (Gov't's Ex. A, at 01:15). While Sergeant Newman was waiting for Defendant to exit the vehicle, Lieutenant Payne remarked to Sergeant Newman that the occupants of the car had sprayed air freshener in the car, and Sergeant Newman agreed that something had been sprayed in the car. (Gov't's Ex. A, at 01:18).

5

Once Defendant joined Sergeant Newman at the back of the black car, Sergeant Newman advised Defendant that the reason he stopped Defendant was because Defendant was following too closely. (Tr. 25; Gov't's Ex. A, at 01:38). Sergeant Newman also asked Defendant what he threw out the window. (Tr. 26). Defendant denied throwing anything out of the window. (Tr. 26; Gov't's Ex. A, at 1:30). Sergeant Newman responded, "Yes, you did; you hit the windshield of my car." (Gov't's Ex. A, at 01:39). Defendant then admitted that he had thrown a cigarette out of the car. (Tr. 26; Gov't's Ex. A, at 01:45).

Sergeant Newman next asked Defendant whether he had just sprayed a bunch of air freshener in the car, and Defendant denied doing so. (Tr. 26; Gov't's Ex. A, at 01:49). Sergeant Newman insisted, "Why am I smelling it then?" (Tr. 26; Gov't's Ex. A, at 01:51). Defendant responded, "Smelling what?" (Tr. 26; Gov't's Ex. A, at 01:52). Sergeant Newman testified that he took Defendant's response "smelling what" as another indicator that Defendant was avoiding his question because it pertained to the concealment of an odor that Defendant did not want him to smell. (Tr. 26). Sergeant Newman replied, "The air freshener." (Gov't's Ex. A, at 01:50). Defendant then stated, "I ain't sprayed nothin in my car." (Gov't's Ex. A, at 01:56).

Approximately one minute into the stop, Sergeant Newman next asked Defendant where he was headed. (Tr. 27; Gov't's Ex. A, at 02:00). Defendant stated that he was going to a friend's house. (Gov't's Ex. A, at 02:03). Sergeant Newman asked where the friend's house was. (Gov'ts Ex. A, at 02:04). Defendant responded, "Macon," and

6

made a gesture with his hand pointed in the direction that he was going. (Tr. 27; Gov't's Ex. A, at 02:05). Sergeant Newman states that in his experience it is another indicator of involvement in criminal activity if a suspect points and directs because doing so is an indicator that the suspect is attempting to persuade the listener to believe what he is saying. (Tr. 27). Sergeant Newman testified that, based on his conferences and his experiences stopping the everyday motoring public, individuals involved in criminal activity typically direct the police to the next large city they are coming into contact with. (Tr. 27). Sergeant Newman explains that in such cases, the suspect does not know how to answer the questions, is trying to do the best that he can, but wants the officer to believe him. (Tr. 27). Sergeant Newman testified that he believes these behaviors to be an indicator of nervousness and evasion of the question. (Tr. 27).

Sergeant Newman asked Defendant what was the address where he was headed. (Gov't's Ex. A, at 02:06). Defendant responded, "1877." (Gov't's Ex. A, at 02:15). At the same time, Defendant interlocked either his left hand over his right wrist or his right hand over his left wrist behind him. (Tr. 28; Gov't's Ex. A, at 02:14). Sergeant Newman testified that Defendant's body language suggested that he was extremely nervous about the questions and that he did not know the answer to the questions. (Tr. 28). Sergeant Newman pressed further, "What street?" (Gov't's Ex. A, at 02:17). Defendant responded, "Davidson." (Gov't's Ex. A, at 02:19). Sergeant Newman asked Defendant where in Macon was Davidson Street located. (Gov't's Ex. A, at 02:20). Defendant responded, "I don't know. I'm supposed to be meeting him." Gov't's Ex. A,

7

at 02:26). Sergeant Newman then asked, "Where you meeting him at?" (Gov't's Ex. A, at 02:28). Defendant allegedly hedged, "Davidson Street or something." (Gov't's Ex. A, at 02:30). Sergeant Newman asked Defendant what was the name of his friend in Macon. (Gov't's Ex. A, at 02:38). Defendant responded that his friend's name was Rick. (Gov't's Ex. A, at 02:39). Sergeant Newman then asked Defendant, "Who is this you've got in the car with you?" (Gov't's Ex. A, at 02:40). Defendant responded, "My brother." (Gov't's Ex. A, at 02:42). Sergeant Newman asked Defendant what his brother's name was. (Gov't's Ex. A, at 02:43). Defendant responded, "Maurice." (Gov't's Ex. A, at 02:45). Sergeant Newman then asked Defendant whether the car he was driving was a friend's car and Defendant responded that it was Maurice's car. (Gov't's Ex. A, at 02:46). Sergeant Newman then asked if Maurice was Defendant's brother or his friend. (Gov't's Ex. A, at 02:52). Defendant responded that Maurice was his brother. (Gov't's Ex. A, at 02:53). Sergeant Newman then clarified, "Blood brother?" (Gov't's Ex. A, at 02:53). Defendant nodded. (Gov't's Ex. A, at 02:52).

Approximately two minutes into the stop, Sergeant Newman told Defendant to remain behind the car and went to the passenger window to talk with Maurice Shuler. (Gov't's Ex. A, at 03:02). Sergeant Newman then asked Maurice Shuler whether the black car was his and asked for his registration. (Gov't's Ex. A, at 03:06; Tr. 30). Sergeant Newman also asked Maurice Shuler where they were headed, and Maurice Shuler responded that they were headed to Macon. (Gov't's Ex. A, at 03:17). Sergeant Newman asked Maurice Shuler what was going on down there, and Maurice Shuler

8

responded that they had "some folks down there." (Gov't's Ex. A, at 03:19). Sergeant Newman asked Maurice Shuler who they were going to meet in Macon and Maurice Shuler responded that he was riding with his brother. (Gov't's Ex. A, at 3:28). Sergeant Newman responded, "I know you're riding with him but you don't know where y'all are going?" (Gov't's Ex. A, at 03:28). Maurice Shuler repeated, "I'm riding with him." (Gov't's Ex. A, at 03:30). Sergeant Newman acknowledged again that Shuler was riding with his brother but told Maurice Shuler that he had to know where he was going. (Gov't's Ex. A, at 3:34). Maurice Shuler responded that he was just riding with him, and offered his identification. (Gov't's Ex. A, at 03:38). After Sergeant Newman responded, "Yeah, if you got it," Maurice Shuler volunteered that he was scared of the police. (Gov't's Ex. A, at 03:45). Sergeant Newman asked Maurice Shuler why and then asked him whether he knew where he was going in Macon. (Gov't's Ex. A, at 03:58). Sergeant Newman left the passenger side of the vehicle and asked Defendant whether he ever had any trouble with his license. Defendant responded no.

**C.** **Sergeant Newman Checked Into Defendant and Maurice Shuler's License and Criminal Histories and Then Resumed Questioning Defendant While He Wrote a Traffic Warning**

Approximately three minutes into the stop, Sergeant Newman returned to his patrol car and called the Blue Light Operations Center ("BLOC"), which was a call center used to check for warrants, license statuses, and criminal history. (Tr. 31). The call took about four and a half minutes. (Tr. 32-33; Gov't's Ex. A, at 04:11-08:41). Representatives at BLOC advised Sergeant Newman that both Defendant and Maurice

9

Shuler had a valid license, they did not have outstanding warrants, and Maurice Shuler had no criminal history. (Tr. 32). BLOC reported that Defendant had prior arrests for giving false information. (Tr. 32). At that time, Sergeant Newman decided that he would exit the patrol car and write Defendant a warning and that while he did so, he would ask Defendant some clarifying questions to see if he could make Defendant's story about where Defendant was going legitimate. (Tr. 32).

Approximately seven minutes and forty-five seconds into the stop, Sergeant Newman left the patrol car and advised Defendant that everything was okay with his license and that Sergeant Newman would issue him a warning. (Tr. 34-35; Gov't's Ex. A, at 08:44). Sergeant Newman testified that usually when he advises a motorist that he is only going to issue a warning, the motorist's nervousness decreases, but Defendant continued to appear nervous. (Tr. 35). While Sergeant Newman was writing out the warning, Sergeant Newman asked Defendant why Maurice Shuler was not driving his own car, and Defendant responded that his brother did not want to drive. (Gov't's Ex. A, at 08:54). Sergeant Newman exclaimed, "He don't even know where y'all going. Any reason he don't know?" (Gov't's Ex. A, at 08:54). Defendant did not answer the question asked, but responded that they were going to pick up a friend. (Gov't's Ex. A, at 09:05). Sergeant Newman then asked, "You're going to pick him up? Now, a while ago, you told me that you was going to meet him." (Gov't's Ex. A, at 09:04). Defendant insisted that they were going to pick the friend up, and the friend had just had an argument with his girlfriend. (Gov't's Ex. A, at 09:07). Sergeant Newman again asked

10

Defendant whether he knew Rick's last name, but Defendant replied, "We just call him Rick." (Tr. 34; Gov't's Ex. A, at 09:25). Sergeant Newman again pressed, "You don't know his last name, . . . huh?" (Gov't's Ex. A, at 9:28). Defendant responded, "Huh?" (Gov't's Ex. A, at 09:30). Sergeant Newman asked Defendant how long he had known Rick, and Defendant divulged that he had known Rick for "almost going on like a year." (Tr. 34; (Gov't's Ex. A, at 09:40). Sergeant Newman testified that only being on a first name basis is consistent with drug trafficking practices because individuals involved in drug trafficking "deal with nicknames" and "claim not to know anybody's full name for purposes of . . . concealing their identity to whoever." (Tr. 34).

Sergeant Newman believed that Defendant continued to evade his questions, which Sergeant Newman considered to be a sign of heightened levels of nervousness. (Tr. 35-36). Sergeant Newman testified that Defendant told him that he met Rick at a club, but when asked what club, Defendant only indicated "a club in Atlanta." (Tr. 36; Gov't's Ex. A, at 09:40, 10:10). Sergeant Newman told Defendant, "Ain't nothing you telling me making no sense. Do you agree or disagree?" (Tr. 36). Defendant chuckled, but did not answer. (Tr. 36; Gov't's Ex. A, at 10:30). Sergeant Newman challenged that Defendant was driving all the way from Atlanta to Macon to pick up a guy whose last name he did not know. (Gov't's Ex. A, at 10:40). Defendant responded, "He's cool though." (Id.). Sergeant Newman told Defendant that he gave him the name of a street that he had never heard of despite having done police work in Macon for eighteen years. (Gov't's Ex. A, at 10:50). Sergeant Newman accused Defendant of making stuff up as

11

he went along, and asked if Defendant agreed that it sounded like he was making stuff up as he went along. (Gov't's Ex. A, at 11:00). Defendant responded, "Nah." (Gov't's Ex. A, at 11:15). Sergeant Newman also pressed that it did not make any sense that Defendant's brother was in the car going somewhere with him, but claimed not to know where he was going. (Gov't's Ex. A, at 11:20). Defendant did not offer any explanation. (Gov't's Ex. A, at 11:30). Sergeant Newman also asked Defendant why his brother told him that he was scared of the police and whether his brother had been previously beaten up by policemen. (Gov't's Ex. A, at 12:00). Defendant responded, "Nah." (Gov't's Ex. A, at 12:20). Sergeant Newman then asked Defendant whether he was transporting drugs or large amounts of United States currency in his vehicle, and Defendant responded that he was not. (Gov't's Ex. A, at 12:38). By this point, Sergeant Newman had completed his investigation of the traffic infraction and had finished writing the warning ticket. (Tr. 65-67).

### D. Sergeant Newman Utilized a K-9 Unit to Search the Vehicle's Exterior and Then Searched the Interior of the Vehicle After the K-9 Alerted

Almost eleven minutes and forty-nine seconds into the stop, Sergeant Newman asked Defendant if he could search the vehicle. (Tr. 37; Gov't's Ex. A, at 12:45). Defendant scratched his head and responded, "Ain't nothin in there." (Tr. 37; Gov't's Ex. A, at 12:50). Sergeant Newman replied, "That ain't what I asked you. I asked you could I search it. It's a yes or no." (Tr. 37; Gov't's Ex. A, at 12:50). Defendant responded, "I ain't got nothing in there." (Tr. 37). At the time Sergeant Newman asked for consent to search the vehicle, Sergeant Newman held the completed warning ticket

12

in his hands, but did not give it to Defendant. (Tr. 66). Sergeant Newman testified that these types of cases, he "run[s] the dog instead of trying to stand there" so it would not appear as if he was trying to coerce Defendant into giving consent. (Tr. 37). Approximately twelve minutes into the stop, Sergeant Newman informed Defendant that he was going to have his K-9 unit walk around the car. (Gov't's Ex. A, at 12:00). As of twelve minutes into the stop, Sergeant Newman still had not given Defendant the written warning. (Tr. 38).

A little over thirteen minutes into the stop, Sergeant Newman walked Paco, the K-9 unit around the vehicle. (Tr. 39; Gov't's Ex. A, at 14:10). When Paco came around the rear of the vehicle, his body posture became rigid, he turned his head towards the trunk seam with the bumper, his breathing became rapid, and he jumped on the bumper and attempted to start scratching it. (Tr. 39; Gov't's Ex. A, at 14:25). According to Sergeant Newman, Paco's behavior was an alert that he had picked up the odor of a narcotic inside the vehicle. (Tr. 39-40). Sergeant Newman continued to walk the dog towards the front of the vehicle and turned him around and walked towards the back of the car from the opposite direction. (Tr. 40). When Paco arrived at approximately the same spot on the backside of the vehicle, Paco's body posture again became rigid, his breathing became rapid, and he began scratching the trunk in the same place. (Tr. 40; Gov't's Ex. A, at 14:38). Paco's search lasted less than forty seconds long. (Gov't's Ex. A, at 14:10-14:42). Once Paco gave a positive alert, Sergeant Newman placed Paco back in the patrol car. (Tr. 41).

13

Sergeant Newman next asked Defendant if he knew whether anyone had smoked marijuana in the car recently. (Gov't's Ex. A, at 15:00). Sergeant Newman explained that the dog alerted twice in the same area and asked Defendant if he knew why the dog might be doing that or whether he transported anything in the car recently. (Gov't's Ex. A, at 15:15). After Defendant denied knowledge, Sergeant Newman informed Defendant of his intent to search the vehicle. (Tr. 41; Gov't's Ex. A, at 15:20). Sergeant Newman then directed Maurice Shuler to exit the car, asked him whether he had any knowledge of whether anyone had smoked marijuana in the vehicle, and told him that the dog alerted to the trunk. (Gov't's Ex. A, at 15:50). Maurice Shuler denied that anyone had smoked marijuana in the car. (Id.).

The officers began the search approximately fifteen minutes into the stop. (Gov't's Ex. A, at 16:05). During the search, the officers found nine United States Treasury checks that appeared to be fabricated between the passenger seat and the center console. (Tr. 42). The officers also found nine fake Pennsylvania driver's licenses in the passenger seat door pocket, five of which had Defendant's picture and four of which had Maurice Shuler's picture. (Tr. 42). Sergeant Newman testified that during the search, the officers also found a green leafy substance which looked like marijuana residue in the carpeted floorboard on the passenger side. (Tr. 41, 54-55). Sergeant Newman did not collect, weigh, or test the residue and did not smell it. (Tr. 54-56). Although Sergeant Newman did not charge Defendant or Maurice Shuler with anything concerning the marijuana, he did make a notation in the K-9 report that he had found

14

marijuana residue in the carpet on the floor. (Tr. 42; Gov't's Ex. 2). No drugs were found in the back of the car. (Tr. 54). Additionally, the officers did not find any other indication that drugs had been used in the car, such as rolling papers, lighters, or roach clips. (Tr. 56). There were no spray bottles found in the vehicle. (Tr. 49, 73). There was also no indication that Defendant or his brother was impaired in any way. (Tr. 56). Approximately seventeen and a half minutes into the stop, the officers handcuffed the Defendants. (Gov't's Ex. A, at 18:20).

## II.    LEGAL ANALYSIS

Defendant argues evidence seized during the search of the vehicle should be suppressed because he was detained and questioned on topics far beyond the traffic control purpose of the stop for longer than what was necessary to write him a ticket for the traffic violation. In response, the Government argues the stop was reasonable both in duration and scope, Sergeant Newman did not impermissibly extend the duration of the stop, and he had reasonable suspicion to extend the search long enough to conduct the dog sniff.

Even without probable cause, the police may stop individuals and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity. United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990) (citing Terry v. Ohio, 392 U.S. 1 (1968)). Typically, an officer's investigation of a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place. United States v. Holt, 777 F.3d 1234, 1256 (11th Cir. 2015); United

States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003); United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). Additionally, the traffic stop must be of limited duration; it "may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity."[2] Boyce, 351 F.3d at 1106; see also Holt, 777 F.3d at 1256; Purcell, 236 F.3d at 1277.

The Government argues Sergeant Newman did not impermissibly extend the duration of the stop because the entire encounter up to the point in which the K-9 unit completed his search was approximately fourteen minutes and thirty-five seconds, and only three minutes of that time were spent on inquiries that were arguably unrelated to the traffic violation. In support, the Government argues Sergeant Newman spent ninety seconds discussing what Defendant threw out the window, the air freshener, and where Defendant was traveling; sixty seconds talking to Maurice Shuler about similar topics while Maurice located the registration; some time performing license checks; and some time talking with Defendant while he completed the written warning.

Sergeant Newman spent the initial moments of the stop retrieving Defendant's license and explaining why he pulled him over. Each of these activities is within the

_____

[2] For purposes of the instant motion, this Court has applied the law as it existed in 2012 because that is when the search occurred. Law enforcement who conduct a search in compliance with binding circuit law at the time have not engaged in culpable conduct if the search later turns out to be unconstitutional because of a change in existing law. Thus, under such circumstances, the officer has behaved reasonably, the exclusionary rule would not yield meaningful deterrence, and evidence obtained as a result of such a search is not excluded. See Davis v. United States, 564 U.S. 229, 239-41 (2011).

16

legitimate scope of a traffic stop. When an officer issues a warning citation during a traffic stop, the stop is not unreasonably prolonged if the officer takes time to explain the citation to the motorist. United States v. Wilson, 662 F. App'x 693, 696 (11th Cir. 2016). Likewise, investigating the driver's license and the vehicle registration are within the legitimate scope of a traffic stop and do not unreasonably prolong the stop. Boyce, 351 F.3d at 1106 & n.3 (quoting Purcell, 236 F.3d at 1278-80).

Although Sergeant Newman next asked Defendant a series of questions as to what he threw out from his window and whether he sprayed air freshener, this extension of the stop was permissible because Sergeant Newman had reasonable suspicion that drug activity was occurring within the car. In the initial moments of the stop, Sergeant Newman explained to Defendant that he stopped him for two reasons. The first was that Defendant was following too closely. Before explicitly stating the second reason, Sergeant Newman started questioning Defendant about what he had thrown out of the window of his car. At this juncture, Sergeant Newman reasonably suspected that Defendant had thrown something out of the window of the car[3] and might be covering up his possession of illegal drugs in the car. While Sergeant Newman extensively questioned Defendant regarding topics other than his alleged traffic infraction of following too closely, such as questions about where Defendant was going and who he was going to see, questioning outside the scope of the purpose of the stop does not

---

[3] Notably, O.C.G.A. § 40-6-248.1 provides that any person littering a highway shall be guilty of a misdemeanor. See also O.C.G.A. § 16-7-42.

17

necessarily render the questioning unlawful. Where the initial stop is legal, the officer has "'the duty to investigate suspicious circumstances that then [come] to his attention.'" United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) (quoting United States v. Hardy, 855 F.2d 753, 757 (11th Cir. 1988)). Thus, an officer may prolong a traffic stop if he has articulable reasonable suspicion of other illegal activity. Boyce, 351 F.3d at 1106; Tapia, 912 F.2d at 1370. Reasonable suspicion must be more than inchoate hunch and instead requires that police articulate some minimal, objective justification for an investigatory stop. Boyce, 351 F.3d at 1107; Tapia, 912 F.2d at 1370. The police officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" further intrusion under the totality of the circumstances. United States v. Bautista-Silva, 567 F.3d 1266, 1272 (11th Cir. 2009); Tapia, 912 F.2d at 1370. Officers are expected to use their experience and specialized training to draw inferences from the cumulative information available to them, including inferences that may evade untrained observers. United States v. Bautista-Villanueva, 524 F. App'x 476, 478 (11th Cir. 2013) ("This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."). A variety of factors may contribute to the formation of an objectively reasonable suspicion of illegal activity, such as inconsistent statements about destination as well as shaking and extreme nervousness. Holt, 777 F.3d at 1256. Additionally, a reviewing court "may not consider each fact only in isolation and

18

reasonable suspicion may exist even if each fact 'alone is susceptible of innocent explanation'" and even if the suspicion ultimately turns out to be incorrect. <u>Bautista-Silva</u>, 567 F.3d at 1272; <u>Bautista-Villanueva</u>, 524 F. App'x at 478.

In this case, Sergeant Newman asserts reasonable, articulable suspicion that Defendant was not only following too closely, but also that he was engaging in other illegal activity as well. Sergeant Newman states that before Defendant pulled the car over, the occupants of the vehicle had thrown something burning, which appeared to be something to smoke out of his window, and it hit the windshield of Sergeant Newman's patrol car. (Tr. 20-21; Gov't's Ex. 1, at 00:27). Consistent with Sergeant Newman's account, the dash camera video depicted Sergeant Newman and Lieutenant Payne discussing that the occupants of the black vehicle hit the patrol car's windshield with something. (Gov't's Ex. 1, at 00:27).

Additionally, upon initially approaching the vehicle and asking for Defendant's driver's license, Sergeant Newman noticed "an overwhelming odor of a masking agent," which Sergeant Newman states was a "fruity air freshener." (Tr. 22). Consistent with Sergeant Newman's account, the video recording of the incident reflects that Sergeant Newman and Payne discussed that the car smelled as if someone in the car had sprayed air freshener. (Gov't's Ex. A, at 01:18). According to Sergeant Newman, in drug trafficking, a masking agent is typically used to conceal the odor, usually of marijuana. (Tr. 22).

The Defendant and his brother also exhibited nervous behavior. Sergeant

19

Newman observed that when he arrived at the passenger window, Maurice Shuler looked straight ahead and was breathing heavily. (Tr. 24). Moreover, Sergeant Newman noticed that Defendant's hand was shaking as he handed Sergeant Newman his driver's license and that Defendant had never turned off the turn signal, which was still making an audible clicking noise. (Tr. 24-25). Sergeant Newman concluded that based on his training, these were indicators that Defendant was overly nervous. (Tr. 24-25). Given the fact that Defendant and his brother both allegedly appeared nervous, and that one of them had thrown something that was burning out of the vehicle after the officers had activated their blue lights behind them and had sprayed an air freshener, Sergeant Newman could have logically inferred that the occupants of the vehicle had thrown something out of the car that they did not want the officers to smell or discover and that it might have been drugs. Each of these factors together constitute an articulable basis for Sergeant Newman to believe that Defendants were engaged in illegal activity and to briefly investigate. See, e.g., Holt, 777 F.3d at 1256-57 (explaining that shaking, failure to make eye contact, and heavy breathing can be factors contributing to a finding of reasonable suspicion); United States v. Castelan-Benitez, 376 F. App'x 934, 936 (11th Cir. 2010) (explaining that passenger and driver's extreme nervousness, suspicious travel explanations, plus the strong smell of air freshener inside the vehicle and the rear cargo area, considered to be an unusual location for an air freshener, formed articulable basis for reasonable suspicion where officer had been trained that these were cues to look for); United States v. Gonzales, 342 F. App'x 446, 449 (11th Cir. 2009)

(concluding that district court did not clearly err in finding that overwhelming odor of nine new air fresheners in the cabin of tractor trailer coupled with nervousness of occupants, among other things, amounted to reasonable suspicion); see also United States v. Lopez, 553 F. App'x 10, 12 (2d Cir. 2014) (explaining that officer had reasonable suspicion that criminal activity was afoot where he noticed two cellular phones and air freshener in defendant's car, noticed that defendant was shaking and breathing irregularly, and defendant had difficulty answering questions about his travel plans); United States v. West, 219 F.3d 1171, 1178-79 (10th Cir. 2000) (explaining that the smell of air freshener within a vehicle is a factor to be considered when evaluating whether there has been an attempt to conceal illegal activity occurring in a vehicle). Here, while individually each of these facts can be explained by innocent behavior and would not be enough to satisfy the reasonable suspicion standard, collectively under Eleventh Circuit law, they justify Sergeant Newman's investigation. United States v. Mincey, No. 16-11813, 2017 WL 3587465, at *1 (11th Cir. Aug. 21, 2017) (explaining that reasonable suspicion may exist even if each fact alone is susceptible of innocent explanation) (citing United States v. Bautista-Silva, 567 F.3d 1266, 1272 (11th Cir. 2009) (explaining that it was error to review factors leading to officer's reasonable suspicion in isolation and conclude that each was susceptible of innocent explanation)); United States v. Mendoza, 658 F. App'x 479, 482 (11th Cir. 2016) (explaining that reasonable suspicion need not rule out the possibility of innocent conduct) (citing United States v. Arvizu, 534 U.S. 266, 273, 277-78 (2002)).

AO 72A
(Rev.8/82)

Once Sergeant Newman began asking Defendant questions, he appears to have been met at times with evasiveness, minimal responsiveness, or inconsistent responses, spurring further suspicion justifying extension of the stop for further questioning. For instance, Sergeant Newman asked Defendant what he had thrown out the window, but Defendant denied throwing anything out the window. (Tr. 26; Gov't's Ex. A, at 1:30). Only when Sergeant Newman pressed Defendant about it, did Defendant admit that he had thrown anything out the window, alleging that he had thrown a cigarette out the window. (Tr. 26; Gov't's Ex. A, at 1:45). Sergeant Newman further observed that although Defendant denied spraying air freshener, Defendant avoided answering Sergeant Newman's follow up question as to why he was smelling it, by deflecting, "smelling what." (Tr. 26; Gov't's Ex. A, at 01:52). Sergeant Newman inferred based on his training, that Defendant avoided his question because it was pertaining to Defendant's attempt to conceal an odor Defendant did not want Sergeant Newman to smell. (Tr. 26).

When Sergeant Newman asked Defendant where he was going, Defendant responded that he was going to a friend's house in Macon. (Gov't's Ex. A, at 02:03). When Sergeant Newman twice pressed for details about the location of Defendant's friend's house in Macon, Defendant first avoided giving Sergeant Newman the name of the street and replied only with a street number. (Tr. 28; Gov't's Ex. 1, at 2:18). Defendant ultimately provided a full address when Sergeant Newman pressed for it, but suggested that he could not tell Sergeant Newman where the address was because he was

going to meet the friend. (Gov't's Ex. A, at 2:20). Defendant then hedged when Sergeant Newman asked him where he was meeting his friend, and Defendant said, "Davidson Street or something." (Gov't's Ex. A, at 3:30).

When Sergeant Newman asked Maurice Shuler where they were headed, Maurice Shuler responded somewhat evasively that they were headed to Macon and that they had some "folks down there." (Gov't's Ex. A, at 3:17). When Sergeant Newman asked who they were going to meet, Maurice Shuler responded only that he was riding with his brother. (Gov't's Ex. A, at 3:28). Sergeant Newman testified that based on his experience and training, it is a common practice in drug trafficking not to give away any details about where one is going because it causes variations in the stories given to the police. (Tr. 36-37). Because Sergeant Newman's questions did not lead to consistent, informative, or clear answers, it was reasonable for Sergeant Newman to infer that Defendant and his brother were being evasive. Nervous behavior, failure to maintain eye contact, shaking, evasiveness in answering questions, and inconsistent statements about travel destination can be the basis for reasonable suspicion of criminal activity. See, e.g., Holt, 777 F.3d at1256-57 (holding that the defendant and his passenger's failure to make eye contact, defendant's shaking hands, his short and vague answers to questions, his whispering something to his passenger before exiting the vehicle, and his providing inconsistent statements about recent travel provided a basis for officer's reasonable, articulable suspicion of other illegal activity justifying the prolongation of the stop); United States v. Boyce, 351 F.3d 1102, 1109 (11th Cir. 2003) (explaining that

23

"conflicting answers about where one is traveling to or from may give rise to a suspicion of drug activity because most drivers know the answers to these questions and because the driver may be trying to hide the fact that he is going to or coming from a known drug-source state"); United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999) (noting inconsistent statements about destination among the factors which have justified further questioning and an objectively reasonable suspicion of illegal activity).

Likewise, Sergeant Newman's subsequent computer check of Defendant and Maurice Shuler's license and their criminal histories for approximately four and a half minutes did not exceed to scope of the stop or unreasonably extend its duration. An officer conducting a routine traffic stop may prolong a traffic stop to investigate the driver's license and vehicle registration, including requesting a computer check, as long as such activities do not prolong the traffic stop beyond a reasonable amount of time under the circumstances of the stop. See Holt, 777 F.3d at 1256; United States v. Purcell, 236 F.3d 1274, 1278 (11th Cir. 2001); United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999). Here, the computer check took less than five minutes and the total stop itself up to the point in which the drug dog alerted was less than fifteen minutes. (Gov't's Ex. A, at 16:05); Purcell, 236 F.3d at 1279 (criminal history search which extended the stop by three minutes was de minimis in the context of the totality of the circumstances of the traffic stop).

Sergeant Newman's investigative activities following the criminal history check were also justified by reasonable suspicion under the circumstances. As noted above,

24

up to the point of the license and criminal history check, Sergeant Newman had an articulable basis for the formation of reasonable suspicion because the occupants of the car had thrown something burning which appeared to be something to smoke out of their car and hit the windshield of his car with it, the smell of air freshener emitting from the car was overwhelming, the occupants of the vehicle appeared nervous, and their answers to questions about their destination and other topics were evasive and at times, inconsistent. (Tr. 22). Thus, Sergeant Newman's continuation of questioning after the license and computer check was justified by his reasonable suspicion. The extended questioning following the license check, however, did nothing to alleviate Sergeant Newman's concerns. Instead, Defendant's answers continued to be somewhat inconsistent, but according to Sergeant Newman, consistent with the behaviors of drug traffickers. When Sergeant Newman asked why Maurice Shuler did not know where they were going, Defendant responded without answering the question and instead answered that they were going to pick up a friend who had an argument with his girlfriend. Previously, Defendant had answered when pressed on the details about where the friend lived that they were meeting the friend, and before that Defendant had answered that they were going to the friend's house. (Gov't Ex. A, at 2:03, 2:26, 8:54). Defendant did not know the last name of the friend, even though he had known the friend for a year, which, in Sergeant Newman's experience, was consistent with drug trafficking practices because drug traffickers deal with nicknames for the purpose of concealing their identities. (Tr. 34). Defendant also still did not explain, when pressed,

25

why Maurice Shuler did not know where they were going, which did not alleviate Sergeant Newman's concern that a common practice in drug trafficking is to avoid giving away details about where one is going because it might cause variations between the stories fellow travelers give to the police. (Gov't's Ex. A, at 11:20; Tr. 36). Accordingly, Sergeant Newman had reasonable suspicion to utilize the drug dog to sniff the car.

Furthermore, for the nearly four minutes Sergeant Newman questioned Defendant following the computer search but before utilizing the drug dog, Sergeant Newman was completing the warning citation form. Law enforcement's unrelated questions which do not take very long to ask or answer during the course of completing the warning citation form do not extend the duration of the seizure. United States v. Burrows, 564 F. App'x 486, 490-91 (11th Cir. 2014) (holding that where officer asked questions unrelated to the purpose of the stop only while writing warning citation for approximately twelve minutes, the officer's questioning did not extend the duration of the stop); United States v. Gonzalez, 275 F. App'x 930, 933 (11th Cir. 2008) (where trooper detained defendant to ask routine questions related to the nature of the traffic stop for approximately eight to ten minutes while completing traffic warning, the period of detention was reasonable); Purcell, 236 F.3d at 1277-79 (concluding that 14-minute period between the initial traffic stop and the driver's consent to the search of his car was not unreasonable, where the officer was waiting for the results from a computer background check and had not given the citation to the driver when the driver consented

26

to the search of his vehicle).  For just over four minutes, Sergeant Newman asked Defendant a number of questions while Sergeant Newman completed the warning citation form, and there is no indication that his doing so impermissibly extended the duration of the stop.  Hernandez, 418 F.3d at 1212 n.7 (pointing out that the "police are not constitutionally required to move at top speed or as fast as possible" and that during the traffic stop, "the police can occasionally pause for a moment to take a breath, to think about what they have seen and heard, and to as a question or so").  Defendant did not lay any factual foundation here for the notion that Sergeant Newman drew out preparing the warning ticket so that he could ask more questions or that it took Sergeant Newman longer than normal to complete the warning form due to his questions.

Nor can this Court conclude that Sergeant Newman's use of the drug dog to sniff the exterior of the car offended the Fourth Amendment.  Because Sergeant Newman had reasonable suspicion that criminal activity was occurring, he was justified in taking the additional time to walk the drug dog around the car.  Illinois v. Caballes, 543 U.S. 405, 409 (2005) (use of a well-trained narcotics detection dog while a motorist is lawfully seized for a traffic violation does not rise to the level of a constitutionally cognizable infringement because use of the dog generally does not implicate privacy interests); United States v. Davis, 343 F. App'x 589, 591 (11th Cir. 2009) (concluding that roadside detention for an additional ten minutes while waiting for canine unit to arrive was not unconstitutional because it was justified by reasonable suspicion that the defendant was involved in criminal activity); United States v. Hernandez, 418 F.3d

27

1206, 1211 (11th Cir. 2005) (explaining that where each answer to the trooper's investigative questions failed to allay his concerns, the trooper's reasonable suspicion was bolstered, and thus, his decision to continue to detain defendant and to call for the drug dog was justified); United States v. Smith, No. 1:16-CR-006-11-ELR-AJB, 2016 WL 7856415, at *8 (N.D. Ga. Dec. 28, 2016) (explaining that "use of drug-detecting dog to sniff for narcotics is a legitimate investigative technique following a traffic stop supported by reasonable suspicion that the vehicle's occupants were involved in drug trafficking").

Additionally, Defendant does not dispute that the drug dog's alert to the trunk of the car provided probable cause for the officers' search of the interior of the car pursuant to the automobile exception of the warrant requirement. United States v. Steed, 548 F.3d 961, 975 (11th Cir. 2008) (holding that once canine gave a positive alert to trailer, officer had probable cause to search trailer pursuant to the automobile exception to the warrant requirement). Probable cause for a search arises when a well-trained drug-dog alerts to drugs. Florida v. Harris, 568 U.S. 237, 245-47 (2013) (explaining that evidence of a dog's satisfactory performance in a certification or participation in a training program can itself provide sufficient reason to trust his alert); Burrows, 564 F. App'x at 491-92; United States v. Tamari, 454 F.3d 1259, 1265 (11th Cir. 2006). Here, Defendant does not dispute that the Sergeant Newman and the K-9 unit were both well-trained and successfully completed courses in narcotics detection, Sergeant Newman and the K-9 unit successfully obtained recertification in narcotics detection by the National

28

Narcotics Detector Dog Association every year Sergeant Newman worked at Lamar County, and Sergeant Newman and the dog typically trained for at least eight hours a month in narcotic detection and tracking. (Tr. 11-13). Thus, the K-9 unit's alert in this case was sufficient to provide probable cause for the search of the automobile.

Based on the totality of the circumstances, under Eleventh Circuit law, this Court cannot conclude that Sergeant Newman's investigation of criminal behavior outside the scope of the traffic violation unreasonably prolonged the duration of the stop. From the inception of the stop until the point in which the drug dog's alert provided probable cause to justify the search of the interior of the car, the investigation had lasted less than fifteen minutes.[4] (Gov't's Ex. A, at 16:05 (showing that search of interior began nearly fifteen minutes into the stop)); Burrows, 564 F. App'x at 490-91 (holding that duration of traffic stop was not measurably extended where traffic stop up to the point where drug dog alerted only lasted twelve minutes and officer asked questions unrelated to the purpose of the stop only while writing warning citation); United States v. Gonzalez, 275 F. App'x 930, 933 (11th Cir. 2008) (where trooper detained defendant to ask routine

_____

[4] In seeking to suppress physical evidence obtained during the search of his vehicle, Defendant relies on United States v. Pruitt, 174 F.3d 1215 (11th Cir. 1999). Pruitt, however, is factually and legally distinguishable. In Pruitt, the officer did not have reasonable suspicion of illegal activity when he questioned the occupants of a van, only evidence of speeding. Pruitt, 174 F.3d at 1218, 1220-21. There, the officer, after being denied consent to search the van, detained the occupants of the van for nearly one-half hour while waiting for the arrival of a drug dog who sniffed the van and alerted to the presence of drugs. Pruitt, 174 F.3d at 1218. In contrast, in this case, Sergeant Newman, in addition to observing Defendant following too closely, had reasonable suspicion of illegal activity and the stop lasted less than fifteen minutes before the drug dog alerted.

questions related to the nature of the traffic stop for approximately eight to ten minutes while completing traffic warning, the period of detention was reasonable); Hernandez, 418 F.3d at 1212 n.7 (expressing doubt that where the traffic stop is valid at its inception, a resulting seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration and lacking knowledge as to any appellate decision that has held that such a short detention linked to a legitimate traffic stop to be an unreasonable seizure under the Fourth Amendment on the account of the stop's duration); United States v. Purcell, 236 F.3d 1274, 1277-80 (11th Cir. 2001) (concluding that 14-minute period between the initial traffic stop and the driver's consent to the search of his car was not unreasonable and that the Eleventh Circuit had approved significantly longer searches). Furthermore, as discussed above, much of the fifteen-minute period was utilized to perform legitimate traffic citation purposes, such as explaining the reason for the stop, performing a computer check, and writing the traffic warning. Accordingly, Defendant's Motion to Suppress should be **DENIED**. (Doc. 292).

## CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress should be **DENIED**. (Doc. 292). As there are no further motions pending with regard to Defendant Gino Shuler, the undersigned certifies this Defendant ready for trial.

30

**SO ORDERED, REPORTED AND RECOMMENDED** this __7___ day of
November, 2017.

/s/Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE